**James Carl Lee DAVIS, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 69467.**

Court of Criminal Appeals of Texas, En Banc.

Sept. 13, 1989.

Rehearing Denied Oct. 25, 1989.

Roy E. Greenwood, court appointed on appeal, Austin, for appellant.

Ronald Earle, Dist. Atty. & Philip A. Nelson, Jr., Asst. Dist. Atty., Austin, Robert Huttash, State's Atty., Austin, for State.

## OPINION

McCORMICK, Presiding Judge.

A jury found appellant, James Carl Lee Davis, guilty of capital murder. The death penalty was assessed as punishment. On appeal to this Court, appellant raises thirteen points of error. We find all points to be without merit and affirm the conviction.

In his first point of error, appellant asserts that the trial court erred when it would not afford him an opportunity to review the veniremen's information cards and biographic questionnaires prior to exercising his option to shuffle the names of the venire. He relies upon Article 35.11, V.A.C.C.P. Appellant's second point of error also relies upon Article 35.11. He contends that regardless of any entitlement to the veniremen's biographical information the trial court erred when it refused to shuffle the names after he so requested. Both points are without merit.

The record reflects that the entire general venire was brought into the court room and was seated in order. Thereafter, the following colloquy occurred in chambers:

"[DEFENSE ATTORNEY]: ... I understand that the jurors have now been seated in the order—or in their proper order in the courtroom.

"THE COURT: That's correct.

\*    \*    \*    \*    \*    \*

"[DEFENSE ATTORNEY]: ... For the record, Judge, we would request an additional hour before we be required to exercise our right to decide whether to move the Court for a shuffle of the panel, in that we cannot adequately make that decision until we have seen some biographical background on the venirepersons. Just merely looking at faces and seeing names does not allow us to make a competent decision. And to deny us that right violates 35.11 of the Code of Criminal Procedure and denies Mr. Davis his right to effective assistance of counsel under the Texas Constitution and the United States Constitution and denies him due process and due course of law under the United States Constitution and Texas Constitution.

"THE COURT: Request denied. The Court will give defense counsel five minutes to look over the jury panel and make their decision whether they wish to shuffle or not.

"(Recess)

"[DEFENSE ATTORNEY]: Judge, at this time we would object—once again, to the Court's refusal to give us any biographical information ... consequently at this time we're just not going to ask for a shuffle, because we can't do it.

"THE COURT: Okay.

\* \* \* \* \* \*

"[DEFENSE ATTORNEY]: We're not saying we don't want a shuffle. We're just saying we can't decide."

The trial judge indicated that he understood appellant's intentions as not wishing to have the veniremen's names shaken; he thus began his initial examination. See Article 35.17(2), V.A.C.C.P. Based upon pretrial publicity in the case, some members of the venire were excused from jury service without objection. Before dismissing the remaining members for the day, the judge gave each a schedule—day and hour—of when to return. That next day, the first venireman, per the scheduled time, returned to the courtroom for individual voir dire examination. Before the State began its individual examination of the venireman, however, appellant urged his motion to shuffle. The request was denied and the trial judge allowed the following to be made a part of the record:

"THE COURT: ... [T]he record will also reflect the previous Defense counsel testimony about all the investigation that they did, having been in receipt of the list of all the veniremen some days previous to the commencement of this trial.

"[PROSECUTOR]: Your honor, perhaps the record should also reflect, I think it does, that counsel were given some time to look over the panel after they were seated in the court room where they were impaneled; that they did look over the panel, but then declined to request a shuffle; and that it was at that time that all the jurors were given their schedule and when to return. And it wasn't until all 125 of those people had left the courthouse with their schedules—

"THE COURT: *The record should also reflect that some jurors were excused, that the Court conducted its Voir Dire in general and then took up the issue of opinion or publicity and excused some half a dozen, I guess, veniremen from different places on the panel.* [Emphasis added.]

"[PROSECUTOR]: .... But my point is that the record should reflect that all of the remaining 100 or so veniremen had been excused and had been given a date and hour to return in the proper sequence, and it would have been impossible to shuffle the panel without individually calling each one of those 100 jurors and giving them a new date and time to come in. Will the record so reflect?

"THE COURT: The record will so reflect."

■ Appellant in his first point of error, asserts that he was entitled to review the juror information cards and his questionnaires [1] before he exercised his option to have the names shuffled. We disagree.

---

1. Apparently, appellant's counsel had contacted each of the prospective jurors and had compiled biographical information on each. The ques-

Article 35.11 creates a statutory privilege that allows the parties in a criminal trial to have the names of the prospective jurors shuffled. The Article reads as follows:

"The trial judge, upon the demand of the defendant or his attorney, or of the State's counsel, shall cause the names of all the members of the general panel drawn or assigned as jurors in such case to be placed in a receptacle and well-shaken, and the clerk shall draw therefrom the names of a sufficient number of jurors from which a jury may be selected to try the case, and write the names as drawn upon two slips of paper and deliver one slip to the State's counsel and the other to the defendant or his attorney."

In interpreting Article 35.11, we have determined that compliance with that statute is had when counsel for either the State or the defendant is allowed the opportunity to view the venire seated in the courtroom in proper sequence and is thereafter allowed an opportunity to exercise his or her option to have the names shuffled. See *Williams v. State*, 719 S.W.2d 573, 575 (Tex.Cr.App. 1986) citing *Stark v. State*, 657 S.W.2d 115 (Tex.Cr.App.1983); *Eldridge v. State*, 666 S.W.2d 357 (Tex.App.—Dallas 1984, pet. ref'd); *Thomas v. State*, 624 S.W.2d 383 (Tex.App.—Fort Worth 1981, no pet.). We have never interpreted the Article as requiring the trial court to afford the defendant anything more than being able to view the outward appearance of the venire members. Indeed, in *Alexander v. State*, 523 S.W.2d 720 (Tex.Cr.App.1975), this Court wrote that "[t]o allow either party to request a shuffle after the voir dire begins ... would permit such an election to be based upon information elicited on voir dire ... *this was not the intent of the legislature.*" 523 S.W.2d at 721 (emphasis added). Following *Alexander*, we hold that because it was not the intent of the Legislature to have the names of the venire shuffled based upon information obtained during voir dire, so too it was not the intent of the Legislature to base the shuffle on information gleaned from juror information cards and/or biographical questionnaires.

tionnaires are not contained in the record on

Moreover, in this case, appellant's counsel requested an hour to review the veniremen's biographical information before he opted to shuffle their names. The statute cannot be read to allow such. In *Williams*, then Presiding Judge Onion, writing for this Court, determined that "[a] shuffle of the jury panel for the case takes a minimal amount of time if properly handled." 719 S.W.2d at 577 n. 5. Accordingly, appellant's first point of error is overruled.

In appellant's second point of error, he asserts that regardless of any entitlement to biographical information the trial court erred when it refused to shuffle the names of the venire after he finally requested such. Again, we disagree.

■ A motion to shuffle the names of the venire must be timely presented to the trial court. We have determined that a motion to shuffle is untimely if presented after the voir dire has commenced. And in *Williams v. State*, supra, this Court determined that for purposes of Article 35.11, voir dire in a non-capital murder case commences when the State begins its examination of the prospective jurors; it does not begin when the judge begins his or her initial instructions.

We reversed Williams' conviction holding that his motion to shuffle the venire, made after the judge's introductory remarks but before the State began its examination, was timely presented. The trial court's refusal to shuffle was therefore reversible error. *Williams*, 719 S.W.2d at 577. See also *DeLeon v. State*, 731 S.W.2d 948, 949 (Tex.Cr.App.1987); *Yanez v. State*, 677 S.W.2d 62, 70–71 (Tex.Cr.App.1984) (Clinton, J., concurring). At first blush it appears that *Williams* would require that the conviction in this case also be reversed; that is, because appellant made his motion to shuffle the veniremen's names before the State began its examination of the prospective jurors the trial court should have granted the motion. Upon closer examination, however, we find that the trial court was justified in denying the motion.

appeal.

■ A unanimous Court in *Williams* adopted Judge Clinton's concurring opinion in *Yanez* and held that voir dire, for purposes of determining when a motion to shuffle is timely in a non-capital case, begins when the State initiates its questioning of prospective jurors. *Williams*, 719 S.W.2d at 577. Judge Clinton, in his concurring opinion to *Yanez*, had written:

"[B]y its enactment of Article 35.17, V.A.C.C.P., the Legislature perceived voir dire as that examination conducted by the prosecution and the defense. Thus, in its original terms, not substantially altered by amendments made in 1973, the trial court may direct counsel to 'conduct the voir dire examination of prospective jurors in the presence of the entire panel' *in an ordinary case;* in a capital felony case, upon demand either party 'is entitled to examine each juror on voir dire individually and apart from the entire panel....'" *Yanez*, 677 S.W.2d at 70–71 (Clinton, J., concurring) (emphasis added).

Judge Clinton made it clear, however, that he was concerned with the determination of when voir dire began in a non-capital case. He further explained in *Yanez* that, "Under 35.17, supra, *only in a capital felony case* is a trial judge authorized to propound questions concerning principles of reasonable doubt, burden of proof, return of indictment, presumption of innocence and opinion." 677 S.W.2d at 70–71 (Clinton, J., concurring) (emphasis added). When voir dire begins in a capital case is set out in Article 35.17(2) V.A.C.C.P. In its entirety, Article 35.17, V.A.C.C.P., reads as follows:

"Art. 35.17. Voir Dire Examination

"1. When the court in its discretion so directs, except as provided in Section 2, the State and defendant shall conduct the voir dire examination of prospective jurors in the presence of the entire panel.

"2. In a capital felony case, *the court shall propound to the entire panel of prospective jurors questions concerning the principles, as applicable to the case on trial, of reasonable doubt, burden of proof, return of indictment by grand jury, presumption of innocence, and opinion.* Then on demand of the State or the defendant, either is entitled to examine each juror on voir dire individually and apart from the entire panel, and may further question the juror on the principles propounded by the court." [Emphasis added.]

Thus, as Judge Clinton observed in *Yanez*, Article 35.17 contemplates that the judge in a capital case (unlike the judge in a non-capital case) is authorized to propound questions concerning "principles as applicable to the case on trial." In a capital case, where the venire has been seated in the order they will be examined and the defendant has been afforded an opportunity to request a shuffle, the voir dire commences when the trial judge begins his examination of the panel.

■ In the case before us, appellant presented his motion to shuffle the names of the venire not only after the trial court had conducted the initial examination per Article 35.17(2), but also after some of the members had been dismissed from service due to pretrial publicity and the remaining venire had been excused from the courtroom with specific instructions of when each member was to return for individual examination. Appellant's motion was therefore untimely and the trial court properly overruled it. See *Roberson v. State*, 582 S.W.2d 422, 423 (Tex.Cr.App.1973); *Griffin v. State*, 481 S.W.2d 838, 839 (Tex. Cr.App.1972). Appellant's second point of error is therefore rejected.

In his third point of error, appellant contends that the trial court improperly sustained the State's challenge for cause to venireman Fabela. He insists that the venireman was qualified to serve as a juror.

After the trial court had questioned him, venireman Fabela was questioned by the State. Significant among that adduced is the following:

"Q. Could you answer those questions [Article 37.071(1) and (2), V.A.C.C.P.] yes, knowing that the death penalty would result?

"A. No.

"Q. You could not?

"A. No.

"Q. Even though the Court would instruct you to answer those questions truthfully ...?

"A. No."

Defense counsel thereafter presented the venireman with several hypothetical situations containing gruesome fact situations and asked the venireman if he "could be honest about it and answer that Number 1 issue if you were convinced to that degree that it was deliberate?" The venireman responded "no," and explained that consideration of the death penalty would prevent him from doing so. The defense attorney persisted in questioning the venireman. The following colloquy took place:

"Q. .... Is there any way that if you were selected as a juror in this case that you could reach down in your heart and set aside your personal feelings against the death penalty—keep those feelings, but set them aside just to the extent that you could follow the law and give an honest answer to those questions.?

"A. I guess I could put my feelings aside and do it, but—you know.

"Q. That's all we can ask...."

At the end of the venireman's examination the State challenged him for cause. The challenge was sustained by the trial court over appellant's objections. Further, the trial court made the following remarks:

"Based upon the Court's hearing the evidence and observing the juror, it was obvious to the Court that this juror's feelings for the death penalty prevent and substantially impair the performance of his duties as a juror. The Court felt that the juror had made it unmistakably clear that he would automatically vote against the death penalty, to the extent—almost to the point of browbeating by Defense counsel caused the juror to change his answers. And for that reason, the challenge for cause was sustained."

In the trial court, the proper standard to be used in disqualifying prospective jurors in death penalty cases is whether their views would prevent or substantially impair the performance of their duties as jurors in accordance with the instructions given and the oaths taken. *Bell v. State*, 724 S.W.2d 780, 794 (Tex.Cr.App.1986) cert. denied, 479 U.S. 1046, 107 S.Ct. 910, 93 L.Ed.2d 860 (1987); *Sharp v. State*, 707 S.W.2d 611, 620 (Tex.Cr.App.1986) cert. denied, —— U.S. ——, 109 S.Ct. 190, 102 L.Ed.2d 159 (1988). "[T]his standard ... does not require a juror's bias [or prejudice] be proved with 'unmistakable clarity.'" *Ellis v. State*, 726 S.W.2d 39, 43 (Tex.Cr.App.1986) cert. denied, 480 U.S. 926, 107 S.Ct. 1388, 94 L.Ed.2d 702 (1987) quoting *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). On appeal, we recognize that great deference must be given to the trial court judge who is in the best position to see and hear the prospective jurors and to evaluate their responses. As such, we will reverse a trial court's ruling on these issues only when the record shows a clear abuse of discretion on the trial court's part.

No such abuse is demonstrated in the record before us. The potential juror answered that he could not answer the punishment questions truthfully knowing that the result would be imposition of the death penalty. When the venireman changed his answer it became an issue for the trial court's resolution. Under such circumstances the trial court is in the best position to evaluate the venireman's answers and to rule accordingly. As stated in *Witt:*

"[A] trial judge's finding that a particular venireman was not biased and therefore properly seated was a finding of fact subject to [28 U.S.C.] § 2254(d). We noted that the question whether a venireman is biased has traditionally been determined through voir dire culminating in a finding by the trial judge concerning the venireman's state of mind. We also noted that such a finding is based upon a determination of demeanor and credibility that are peculiarly within the trial judge's province. Such determinations are entitled to deference even on direct review...." 469 U.S. at 428, 105 S.Ct. at 854 (footnote omitted).

The trial judge found the venireman unqualified to sit as a juror. The record supports the trial court's finding and, as such, we hold that the trial court did not abuse its discretion when it sustained the State's challenge for cause. Appellant's third point of error is overruled.

In his fourth point of error, appellant asserts that the trial court erred when it sustained the State's challenge for cause to venireman Townsend. Appellant acknowledges that the venireman's answers were sufficient to have disqualified her but insists that the trial court should have allowed him the opportunity to question the juror further.

During an extensive examination by the State, the prospective juror testified that she did not "believe in capital punishment." The prosecutor asked her if she could "vote for the death penalty if the State proved all the elements of· the offense, and the conduct was deliberate, and there was future dangerousness beyond a reasonable doubt?" Unequivocally, the juror answered "no." Upon further examination she testified that she would automatically vote "no" on the punishment issues. Nevertheless, during examination by defense counsel, the venireman testified that she would answer all issues submitted to her truthfully. After this the trial court conducted a further examination:

"THE COURT: Let me talk to you again, Ms. Townsend, because you've told the State that you would never vote yes on the death penalty, and you've told the Defense that you would. . And I have to make the decision of exactly what you would do.

"I think what you've said is that you could sit in a death penalty case, and if the evidence convinced you beyond a reasonable doubt, you could find someone guilty of capital murder; is that right?

"MS. TOWNSEND: No.

"THE COURT: You would not?

"MS. TOWNSEND: No, I don't believe in capital punishment.

"THE COURT: .... If there was a capital murder case that's—not this one but any one. They put on all this, that

someone committed this crime, and you— the evidence convinced you—you knew that the evidence was beyond a reasonable doubt that they, you know, committed that murder, could you vote—find them guilty?

"MS. TOWNSEND: Not with death.

\*    \*    \*    \*    \*    \*

"THE COURT: .... Could you find someone guilty and answer those two questions yes, knowing that the death penalty would be invoked, or would you not be able to do that?

"MS. TOWNSEND: No."

The State, after this final exchange, challenged the venireman for cause and the trial court sustained the challenge. The defense attorney then requested additional time to talk to the venireman "about specific cases where she might consider the death penalty." The trial court refused the request and appellant's attorney stated that if he had been given the opportunity, he would have asked the venireman "all of the same questions on her death penalty views and regarding the death penalty that we asked venireperson Robert Fabela."

■ Initially we hold, as appellant concedes, the trial court did not abuse its discretion in sustaining the State's challenge for cause. *Wainwright v. Witt,* supra. We also hold that the trial court did not abuse its discretion in refusing defense counsel addition time to question the venireman.

In *White v. State,* 629 S.W.2d 701, 706 (Tex.Cr.App.1981) cert. denied, 456 U.S. 938, 102 S.Ct. 1995, 72 L.Ed.2d 457 (1982), we held that no reversible error was presented although the trial court refused defense counsel an opportunity to further question a prospective juror. We noted "that the venire member was questioned at length and she unequivocally stated that she could not vote for the death penalty...." 629 S.W.2d at 706. See also *Drinkard v. State,* 776 S.W.2d 181, 184 (Tex.Cr.App.1989); *Burns v. State,* 556 S.W.2d 270, 276–278 (Tex.Cr.App.) cert. denied, 434 U.S. 935, 98 S.Ct. 422, 54 L.Ed.2d 294 (1977). So too here, the venireman

stated that she could not find a person guilty of capital murder knowing that the death penalty would be imposed. Only after this response did the trial court restrict questioning of the venireman. We hold that the trial court did not abuse its discretion in refusing appellant's attorney an opportunity to ask the venireman about hypothetical situations. Appellant's fifth point of error is overruled.

In his sixth point of error, appellant asserts that the trial court erred when it sustained the State's challenge for cause to venireman Zuefeldt.

Zuefeldt was extensively examined by the trial court, the prosecutor and the defense. At one point during the examination the prosecutor asked "whether your feelings about the death penalty would substantially impair you from doing your duty as a juror in accordance with oath and your instructions ... or from doing your duty, in any event, on these two special punishment issues?" The venireman responded that "I think they would. I think that I can see on the second part, the probability, that I could probably justify answering no to that question, giving the person the benefit of the doubt that they could rehabilitate." Later the venireman was asked if he could be fair to the State; he responded that he "disagree[d] with the State in that execution should occur" and stated that he "may decide on one of those questions to answer it no so that the execution wouldn't occur."

■ Asked by the defense if he could imagine possible situations that would call for the death penalty, the venireman responded that "there could be a scenario where that would be the case, but I can't think of what it is." The venireman testified that he would be a fair juror but later explained that because he had a problem with the law "[t]he State probably would not think [him to be fair], because I would be trying to mitigate the law." After the State challenged the prospective juror for cause, the trial court ruled:

"I think having listened to the venireperson for well in excess of an hour, having closely observed his demeanor and his tone of voice and his struggles with his conscience, that I feel he could not consider the full range of punishment. He was quite truthful and candid when he felt that it would impair his ability to serve as a juror...."

The venireman's answers clearly indicated that his beliefs concerning the death penalty would impair his duties as a juror. Under *Wainwright v. Witt*, supra, the trial court did not abuse its discretion in sustaining the State's challenge for cause. See also *Landry v. State*, 706 S.W.2d 105, 108 (Tex.Cr.App.1985) cert. denied, 479 U.S. 871, 107 S.Ct. 242, 93 L.Ed.2d 167 (1986); *Bird v. State*, 692 S.W.2d 65, 75–76 (Tex. Cr.App.1985) cert. denied, 475 U.S. 1031, 106 S.Ct. 1238, 89 L.Ed.2d 346 (1986). Appellant's sixth point of error is overruled.

In his seventh point of error, appellant asserts the trial court erred in sustaining the State's challenge for cause to venireman Nazro.

Venireman Nazro testified that he felt that the State did not have the right to execute persons. He stated that he "rejoiced back in the 60's when the Supreme Court threw [the death penalty] out." The venireman based his beliefs upon his religious principles. At one point in the voir dire, he answered:

"If I got down to it, would I be honest to the oath, or would I be honest to the commandments? I—I still just can't see that I would, even if it's this sort of automatic thing, put somebody in the death chamber. I think I would probably rationalize my way out of it somehow. And the oath would probably go before the other."

Again, as in the previous three points of error, the trial court was faced with a prospective juror who voiced problems with the death penalty and indicated that his beliefs would impair his duties as a juror. The venireman in this case is like the veniremen in *Landry v. State*, 706 S.W.2d 105 (Tex.Cr.App.1985) cert. denied, 479 U.S. 871, 107 S.Ct. 242, 93 L.Ed.2d 167 (1986). In *Landry* this Court wrote:

"Both jurors expressed personal or religious scruples against the death penal-

ty. Both jurors stated that they believed the death penalty to be inappropriate in most instances. While it was not impossible that they would answer the questions 'yes,' it was not probable. Finally, both jurors indicated that their personal beliefs would guide them in answering the special issues rather than the law. Under *Wainwright v. Witt*, 469 U.S. 412, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), a prospective juror whose views will prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath, may be constitutionally excluded." 706 S.W.2d at 108.

■ Here, as in *Landry*, from the record before, we cannot say the trial court abused its discretion in sustaining the State's challenge for cause. *Wainwright v. Witt*, supra; *Landry*, 706 S.W.2d at 108; *Bird v. State*, supra. Appellant's seventh point of error is overruled.

Appellant's points of error numbers eight, nine and ten are all contingent upon his assertion that the evidence is insufficient to prove the indictment's allegations that the murder in this case was committed in the course of burglary.[2]

Appellant does not contest the sufficiency of evidence to sustain the other elements of burglary, nor those elements showing murder. His specific complaint is that the State failed to sufficiently prove that he entered the home without the effective consent of the owner.

In pertinent part, the indictment in this case avers that:

"James Carl Lee Davis on or about the 3rd day of March A.D. 1984 ... did then and there intentionally and knowingly cause the death of and individual, to wit: Yvette Johnson, by beating the said Yvette Johnson with a pipe and by beating the said Yvette Johnson with an instrument the exact nature and description of which is to the Grand jury unknown; and the said James Carl Lee Davis did then and there intentionally cause the death of the said Yvette Johnson ... while in the course of committing and attempting to commit the offense of burglary of the habitation of Pauline Johnson."

A brief review of the facts is necessary. Pauline Johnson, lived with her children, Yvette, Tyran, Tony, Timothy, and her niece, Angela Varnado. On the night of March 2, 1984, Johnson left her children alone and went to visit a friend.

In the middle of the night, appellant entered the Johnson home and went into the bedroom where Angela was asleep. Appellant grabbed her and began to beat her on the head with a pipe. Angela screamed. Yvette, in a nearby room, yelled, "What is it?" Appellant released Angela after Yvette had yelled. He went into the bedroom where Yvette was with her two brothers, Tony and Tyran. Angela fled the house, running to a neighbor's home where she was allowed to call authorities.

Timothy Johnson, asleep in another bedroom, was awakened by the screams of his sister. He could see appellant walk to the bedroom where Yvette, Tony and Tyran were. He testified that it appeared that appellant was having intercourse with someone on the floor. Appellant, after a while, entered into Timothy's room and tapped him on the foot. When Timothy did not stir appellant left, closing the bedroom door.

Technicians from Austin's Emergency Medical Services found Tony dead and Tyr-

---

**2.** Appellant in his eighth point of error asserts that the trial court erred in overruling his motion for directed verdict of acquittal because the evidence was insufficient to prove the burglary allegations. In his ninth point of error, he alleges that the trial court erred in submitting an instruction in its charge to the jury that authorized conviction for murder in the course of burglary. And in his tenth point of error, appellant asserts that the trial court committed fundamental error because it did not require the jury to specify which of the alternative theories of capital murder (murder in the course of sexual assault or murder in the course of burglary) formed the basis for the general guilty verdict. He argues that because the jury could have based its decision on an indictment's allegation that is supported by insufficient evidence the trial court erred in failing to require specificity from the jury. This error, appellant asserts, acted to deprive him of due process of law.

an to be near death. Yvette was on the floor, also near death. Both Tyran and Yvette later died. The cause of death of Yvette and her two brothers was multiple skull fractures. In Yvette's case, death was associated with evidence of a sexual assault—extending from the wall of the back part of her vulva there was a three-inch deep laceration. The vagina was filled with blood. Medical testimony indicated the tearing to be consistent with the insertion of a threaded pipe. The State put on evidence of which indicated that pubic hair samples taken from a pair of men's underwear found concealed in a trailer behind appellant's apartment matched those of the victim, Yvette Johnson. Blood stains found on other items of clothing hidden in the trailer also matched those of the victim. A forensic serologist testified that semen samples taken from vaginal smears of Yvette compared favorably with samples taken from appellant.

■ Pauline Johnson testified that she did not give appellant permission to enter her home on the night of the murders. Nevertheless, appellant argues that there were others in the house on that night and that they could have given him consent to enter. Appellant supports this argument by pointing to testimony indicating he had played occasionally with the boys and had been in the home previously with Johnson's permission. If he had the consent of one of the children then, according to appellant, the offense of burglary was not committed.[3] We do not agree with appellant.

There is direct testimony that, as alleged in the indictment, Pauline Johnson, was the owner of the home and she did not give appellant permission to enter on the night of the murders. (Vol. XXXIII, p. 332). Appellant did not testify but asks us to assume that the children gave him permission to enter the home. In *Mixon v. State*,

365 S.W.2d 364 (Tex.Cr.App.1963), the similar argument was made that the wife of the named complainant who did not testify at trial could have permitted the defendant to enter the home and that therefore the evidence was insufficient to sustain a burglary conviction. Judge Morrison writing for the Court affirmed the conviction:

> "Appellant did not testify or offer any evidence in his own behalf.... He first contends that, even though Kenneth Smith testified that the property was taken from his apartment without his consent, the State did not make out a case because they failed to propound the same question to Smith's wife. The indictment charged a breaking of a house with intent to steal Smith's property. Kenneth's testimony was sufficient to make out the State's case." 365 S.W.2d at 366.

Quoting from Branch's Annotated Penal Code, Judge Morrison concluded that " 'the State is not required to prove that the defendant did not have the consent of persons not named in the indictment to take the property therefrom.' " 365 S.W.2d at 366, quoting 4 Branch's Ann. Penal Code, Section 2536, p. 864 (2nd Ed.1956). *Mixon* was subsequently followed in *Brown v. State*, 657 S.W.2d 797 (Tex.Cr.App.1983). There, this Court wrote:

> "The State, proved lack of consent for entry of the burglarized house by the testimony of the alleged owner. However, the appellant urges this was not sufficient since the wife of the alleged owner was not asked whether she had consented to the entry of the house. This contention has no merit." *Brown*, 657 S.W.2d at 797 citing *Mixon* along with *Fletcher v. State*, 396 S.W.2d 393, 395–396 (Tex.Cr.App.1965) cert. denied, 386 U.S. 928 [87 S.Ct. 871, 17 L.Ed.2d 800] (1967), and *Hogan v. State*, 529 S.W.2d 515, 516 (Tex.Cr.App.1975).

---

**3.** V.T.C.A., Penal Code, Section 30.03 defines the offense of burglary as follows:

"(a) A person commits an offense if, without the effective consent of the owner, he:

"(1) enters a habitation or a building (or any portion of a building) not then open to the public, with the intent to commit a felony or theft; or

"(2) remains concealed, with the intent to commit a felony or theft, in a building or habitation; or

"(3) enters a building or habitation and commits or attempts a felony or theft."

See also Article 21.08, V.A.C.C.P. Thus, the State was not required to disprove that others in the house on the night of the murders did not consent to appellant's entrance. It was sufficient for the State to prove that, as alleged in the indictment, Johnson did not consent.

Because we have addressed appellant's sufficiency argument adversely to him, we overrule all three points of error that are contingent upon there being insufficient evidence to support the indictment's allegations that murder was committed in the course of burglary.[4]

In his original and supplemental briefs, appellant challenges the constitutionality of Article 37.071(g), V.A.C.C.P. That Article provides that "[t]he court, the attorney for the state, or the attorney for the defendant may not inform a juror or a prospective juror of the effect of failure of the jury to agree on an issue submitted under this Article." Article 37.071(e), V.A.C.C.P. provides that if a jury is unable to answer any of the special issues submitted to it under Article 37.071(b), V.A.C.C.P., the trial court shall sentence the defendant to life imprisonment. Appellant insists that this information should have been given to the jury and because it was not he concludes that Article 37.071(g) works to "deprive[ ] the jurors of sufficient understanding of their deliberation proceedings," thus depriving him of due process of law. Based on the assumption that Article 37.071(g) is unconstitutional, appellant, in points of error numbers eleven and twelve, contends that the trial court erred when it refused to allow him the opportunity to explain to the jury the result of its failure to agree on the special issues. Appellant's contentions are without merit.

The jury in a capital murder case is responsible for answering questions the result of which will determine the life or death of an individual. Any information that is given the jury which may be interpreted by it as relieving that responsibility is considered an infraction upon the jury's fact finding function. See, e.g., *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) (jurors improperly told that their decision was "reviewable"). In rejecting the same challenge made by appellant in this case, the United States District Court for the Eastern District of North Carolina observed:

"Petitioner contends that a juror who conscientiously believes that the evidence called for a life sentence might nevertheless vote for the death penalty in order to avoid mistakenly assumed consequences of jury deadlock. Although this scenario is plausible, so is the converse possibility that a juror convinced of the appropriateness of a life sentence would refuse to consider the evidence and the views of other jurors in support of the death penalty, knowing that his blind obstinance would preforce result in a life sentence. Neither scenario results in a 'reliable' or desirable process of deliberation, but the court cannot say that the first scenario is significantly more likely to occur as a result of not giving the instruction than is the second as a result of giving it." *Barfield v. Harris*, 540 F.Supp. 451, 472 n. 17 (E.D.N.C.1982) affirmed, 719 F.2d 58 (4th Cir.1983) cert. denied, 467 U.S. 1210, 104 S.Ct. 2401, 81 L.Ed.2d 357 (1984).

At least two State appellate courts agree with the *Harris* opinion. In *Justus v. Commonwealth*, 220 Va. 971, 266 S.E.2d 87 (1980), the Supreme Court of Virginia observed that informing the jury that its failure to agree would result in a life sentence would have been "an open invitation for the jury to avoid its responsibility and to disagree." 220 Va. 971, 266 S.E.2d at 92. Subsequent to *Justus*, the North Car-

---

4. Appellant was indicted for murder in the course of sexual assault and murder in the course of burglary. The charge authorized conviction if the jury found that appellant murdered either in the course of sexual assault or murdered in the course of burglary. Appellant does not contest the sufficiency of the evidence as it pertains to the sexual assault allegations.

It is settled law that where two underlying offenses are charged, the State need only prove one of the two offenses to support the conviction. *Pinkerton v. State*, 660 S.W.2d 58, 62 (Tex. Cr.App.1983), and cases cited therein. This is an additional reason to reject appellant's argument that the trial court erred in failing to direct a verdict of acquittal.

olina Supreme Court has joined the Virginia Supreme Court in rejecting the same arguments advanced by appellant in this case. *State v. Smith*, 305 N.C. 691, 292 S.E.2d 264, 276 (1982). We agree with the holdings of both State Supreme Courts. Additionally, we fail to see any relevance in informing the jurors the result of their failure to agree; this information has no pertinence to the special issues that are submitted to a jury in a capital murder case. See and cf. *Franklin v. Lynaugh*, 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988); *Cordova v. State*, 733 S.W.2d 175, 189–190 (Tex.Cr.App.1987) cert. denied, — U.S. —, 108 S.Ct. 2915, 101 L.Ed.2d 946 (1988); *Johnson v. State*, 691 S.W.2d 619, 625–626 (Tex.Cr.App.1984) cert. denied, 474 U.S. 865, 106 S.Ct. 184, 88 L.Ed.2d 152 (1985); *Stewart v. State*, 686 S.W.2d 118, 121 (Tex.Cr.App.1984) cert. denied, 474 U.S. 866, 106 S.Ct. 190, 88 L.Ed.2d 159 (1985); *Quinones v. State*, 592 S.W.2d 933, 947 (Tex.Cr.App.) cert. denied, 449 U.S. 893, 101 S.Ct. 256, 66 L.Ed.2d 121 (1980). While the information represents a correct statement of the law, it concerns a procedural matter and is not the proper subject of an instruction by the trial court or comment upon by the litigants. See *Justus*, 226 S.E.2d at 92. See also *Smith*, 305 N.C. 691, 292 S.E.2d at 276; *State v. Hutchins*, 303 N.C. 321, 279 S.E.2d 788, 807 (1981); *State v. Johnson*, 298 N.C. 355, 259 S.E.2d 752, 762 (1979). But see *State v. Williams*, 392 So.2d 619, 633–635 (La. 1980) (opinion on rehearing). Therefore, we hold that Article 37.071(g) did not work to deprive appellant of his due process rights and, as such, the trial court did not err when it refused to either instruct the jury or allow appellant the opportunity to inform the jury that its failure to decide the special issues would automatically result in imposition of a life sentence. Appellant's eleventh and twelfth points of error are overruled.

In his thirteenth point of error, appellant claims that the prosecutor improperly commented upon his failure to testify by referring to his lack of remorse. During final argument in the punishment phase of the trial, the prosecutor stated:

"Officer Saldana transports him downtown to the police station, and he sees an ambulance, and he says, 'Are the people I beat up in there? I hope I didn't fuck them up too much.' Then he gets down to the police station at 1:15, Officer Saldana is reading him his rights and asks him if he understands them. He says, 'Well, I guess I could be a bad ass and say no, but I'm not going to do that, because I didn't do anything wrong.'

\* \* \* \* \* \*

"Well, if that wasn't enough, Sergeant Hesskew, who was in the Judge's office when he was warned, described him as being arrogant. And then Dr. Coons and Parker, who examined him for three hours, told you that he knew perfectly well what was going on, he was able to understand their conversation, and they were able to understand his. He showed no remorse, and he hasn't showed any remorse yet."

After this statement, appellant objected and the trial court overruled the objection. The prosecutor then explained:

"We've had plenty of witnesses that have had contact with him after these murders occurred that have said that he showed no remorse. And I refer you to those witnesses who observed him and who were with him for several hours after these murders occurred, and you determine whether or not he's remorseful based on what they told you.

\* \* \* \* \* \*

"[A]nd after he got in there and the Judge told him his warnings, first of all he asked the Judge for a comb. A cold-hearted killer. He doesn't care. Then he's posing for the cameras when he gets out there.... He's smiling, and he's clowning for the cameras."

■ This Court has held that commenting upon a defendant's failure to show remorse during trial of the case is tantamount to a comment on his failure to testify when the record fails to reflect evidence of the defendant's actions during that trial. *Dickinson v. State*, 685 S.W.2d 320, 324 (Tex.Cr.App.1984). If, however, evidence

contained in the record supports the comment then no error is shown. *Fearance v. State*, 771 S.W.2d 486, 514 (Tex.Cr.App. 1988). See *Hawkins v. State*, 660 S.W.2d 65, 79 (Tex.Cr.App.1983) (plurality opinion). See also *Dickinson*, 685 S.W.2d at 324 (distinguishing *Hawkins* by noting that the prosecutor's comments in that case were supported by what the jury had observed during trial). Here, the prosecutor clearly explained to the jury that she was referring to the evidence in the record. These comments are indeed supported by testimony heard by the jury during the trial of this case. The argument was therefore a proper summation of the evidence. *Fearance*, 771 S.W.2d at 514. Appellant's thirteenth point of error is overruled.

The judgment of the trial court is affirmed.

CLINTON, J., concurs in the result.

TEAGUE, J., dissents to disposition of points of error 1, 2, 3 and 5.