Charles Denver RAILSBACK,
Appellant,

v.

The STATE of Texas, Appellee.

No. 01–00–01185–CR.

Court of Appeals of Texas,
Houston (1st Dist.).

Nov. 21, 2002.

Rehearing Overruled Jan. 17, 2003.

W. Troy McKinney, Houston, for Appellant.

Rikke Burke Graber, Assistant District Attorney, Houston, for State.

Panel consists of Justices TAFT, RADACK and ALCALA.[1]

## OPINION

SHERRY RADACK, Justice.

Appellant, Charles Denver Railsback, was charged in a two-paragraph information with driving while intoxicated (DWI) by not having the normal use of his mental and physical faculties and by having an alcohol concentration of at least .08 in his breath. A jury found appellant guilty of DWI, and the trial court assessed punishment at 180 days in jail, probated for one year, and a $1,000 fine. *See* TEX. PEN.CODE ANN. § 49.04 (Vernon Supp.2002). Appellant brings ten points of error, challenging (1) the exclusion of portions of appellant's expert witness's testimony on the Intoxilyzer 5000; (2) the State's jury argument that a breath test result above the legal limit automatically meant appellant was guilty; (3) the exclusion of evidence about the lack of the State's witness's specialized training; (4) the denial of appellant's request for a jury shuffle; (5) comments made by the State during voir dire; and (6) the trial court's alleged comment on the evidence. We affirm.

---

1. This case was submitted to a panel consisting of Chief Justice Michael H. Schneider and Justices Nuchia and Radack. Chief Justice Schneider, however, resigned from the court on September 6, 2002, to assume a position as Justice on the Texas Supreme Court and did not participate in this opinion. Acting Chief Justice Hedges replaced former Chief Justice Schneider with Justice Alcala.

## Facts

On June 3, 2000, Houston Police Officer William H. Lindsey was stopped at a red stop-light next to a Jeep Cherokee. When the stop-light turned green, appellant accelerated at a high rate of speed. Lindsey paced appellant's car using a radar gun and determined the Jeep was traveling at 60 miles per hour in a 35 mile per hour zone. Lindsey stopped appellant for speeding. When he approached the driver's side window of appellant's car, Officer Lindsey saw two passengers and noticed a strong alcoholic-beverage smell. Lindsey described appellant as having glassy, watery eyes, a dazed look on his face, and having somewhat slurred but understandable speech. Lindsey and Houston Police Department Sergeant C.B. Morton administered the horizontal-gaze-nystagmus, Rhomberg, one-leg-stand, and walk-and-turn tests to appellant at the scene of the stop. The officers testified that the results of these tests indicated a strong possibility to them that appellant was intoxicated, although appellant did not stumble or have trouble following the officers' instructions. Appellant told the officers that he had consumed three beers and one shot of tequila in the previous three and one-half hours.

Appellant was taken to a police station where Officer Paul Witherington readministered the Rhomberg, one-leg-stand, and walk-and-turn tests. Although appellant did poorly on these tests, he was able to recite the alphabet and touch his nose. Witherington did not notice that appellant had slurred speech or smelled of alcohol. At trial, Witherington stated that appellant's performance on the field-sobriety tests could have been normal if pre-existing injuries were affecting appellant's physical abilities. Appellant testified that he had previously undergone back surgery, and Officer Morton agreed with appellant

at trial that appellant was approximately 60 to 80 pounds overweight at the time of his arrest.

Appellant took a breath test, which was analyzed by an Intoxilyzer 5000 breathalyzer. The test result indicated an alcohol concentration of 0.134 and 0.130 grams of alcohol per 210 liters of breath. For purposes of a DWI charge, intoxication is defined as having an alcohol concentration of 0.08 grams of alcohol per 210 liters of breath. TEX. PEN.CODE ANN. § 49.01 (Vernon Supp.2002). Intoxication is also defined as "not having the normal use of mental or physical faculties by reason of the introduction of alcohol ... into the body." *Id.* The trial court's charge submitted both definitions to the jury.

At trial, appellant called Dr. Ken Smith, Ph.D., a physics professor at Rice University, as an expert witness on the Intoxilyzer 5000. The trial court sua sponte questioned the relevancy of Dr. Smith's potential testimony:

> What—what I'm trying to figure out is under [Texas] Rule [of Evidence] 104, whether or not he has anything relevant to say with regard to this case, or is he just going to testify about potential problems generally with the Intoxilyzer, or whether there's problems with this Intoxilyzer. I don't want to—I don't want to put the Intoxilyzer instrument on trial—at least not in here—in this case.

Despite the trial court's initial unwillingness to allow testimony of general problems with the Intoxilyzer 5000, Dr. Smith was permitted to testify about several flaws in the machine.

## Exclusion of Dr. Smith's Testimony

◼ In points of error one through five, appellant argues the trial court erred when it excluded some of Dr. Smith's testimony on grounds of relevance. Appellant con-

tends in points of error one through five that Dr. Smith should have been able to testify about (1) the "underlying theories that breath-test machines are premised on, and why they're inaccurate"; (2) "why the computation the machine makes is not accurate"; (3) why "the theory underlying the breath-test techniques is not valid for the Intoxilyzer 5000"; (4) why the techniques applied in this case were not scientifically valid for the Intoxilyzer 5000; and (5) the effects of the blood-breath ratio, body temperature, and hematocrit level on the validity of the Intoxilyzer 5000 result, and their meaningfulness to appellant's intoxication in this case.

The trial court ruled that it was excluding some of appellant's proposed testimony on grounds of relevance. The trial court agreed to admit evidence of specific problems with the Intoxilyzer 5000 as it applied to the facts of the case, ruling that, "[I]f he did some tests on this instrument, if he did some breath or blood—uh—ratio test ... or if this instrument was in some way deficient or out of repair or not in good repair, then, certainly I think that's all relevant ..." However, the trial court did not want Dr. Smith to testify about possible flaws in the general underlying theories that the Intoxilyzer was based on, stating that "[W]ith respect to the underlying theory of breath testing generally, I think that's far afield ... and ... it takes up too much time ...."

It has been well established that a defendant has the right to attack the weight and credibility of evidence presented against him by the State, and courts have specifically recognized the right of a defendant to attack breath-test results. *Love v. State*, 861 S.W.2d 899, 903 (Tex.Crim.App. 1993) (noting that defendant's proposed attack on intoxilyzer results would make it less probable that he was intoxicated); *Moore v. State*, 981 S.W.2d 701, 708 (Tex.

App.-Houston [1st Dist.] 1998, pet. ref'd) ("[I]f a defendant wishes to attack the reliability of breath testing as a rule or the reliability of a specific testing instrument, he may do so.").

In this case, while the trial court initially ruled that it would not allow Dr. Smith to testify as to a flawed general underlying theory, it is not clear from the record that Dr. Smith was prohibited from discussing the matters that appellant asserts in points of error one through five. The record indicates that Dr. Smith attacked the reliability of the Intoxilyzer 5000 by testifying that it did not test the "whole breath" of a person, and he was able to explain in detail why that could cause erroneous results. Dr. Smith also discussed the importance of the observation period used in the testing process and the possibility of error that could result when the observation period was not adequate. Dr. Smith also testified that everyone has different body and breath temperatures, which could affect the results of the Intoxilyzer test. In response to a hypothetical, Dr. Smith testified that a 265–pound person who consumed three beers and a shot of tequila within three and one-half hours could not have achieved a .13 blood-alcohol level. Dr. Smith stated that a result of .13 could not be a reliable result and would be wrong. Finally, Dr. Smith testified that reliability studies done on the Intoxilyzer 5000 were not accurate because the simulation of lungs in the tests were not accurate representations of human lungs.

 If Dr. Smith was prohibited from testifying as to relevant matters, those matters needed to have been adequately detailed in an offer of proof if they were not apparent from the context of the questioning. TEX.R. EVID. 103(a)(2). Here, it is not clear what testimony Dr. Smith was prohibited from giving, so an offer of proof was necessary to preserve error for our

review. *Id.; Garza v. State,* 846 S.W.2d 936, 939 (Tex.App.-Houston [1st Dist.] 1993, pet. ref'd). An offer of proof needs to show the facts that a defendant wishes to prove; if it does not do so, the issue is not preserved for appellate review. *Jenkins v. State,* 948 S.W.2d 769, 775 (Tex. App.-San Antonio 1997, pet. ref'd).

Appellant's offer of proof in this case was as follows:

> Had you heard Dr. Smith testify, he would have told you that the theory underlying the breath-test technique is not valid for the Intoxilyzer 5000.... He would have also testified that the techniques applied in this case wasn't [sic] scientifically valid for the Intoxilyzer 5000, and that there were a number of assumptions that breath-test machines, the 5000 included, make that are based upon ... Dr. Smith would have—uh—talked about the 2100-to-1 blood-breath ratio and how that did not necessarily apply to [appellant] in this case, and if he had a different ratio, that he—the Intoxilyzer would have read too high for him. The same in terms of temperature, his body temperature and hematocrit level.

Appellant's offer of proof fails to show us that Dr. Smith was unable to testify about the matters asserted in appellant's points of error one through five. In points of error one and three, appellant complains that Dr. Smith was not able to testify about faulty underlying theories that make the Intoxilyzer inaccurate. However, Dr. Smith testified that the Intoxilyzer 5000 is not as accurate as the reliability studies indicate, because the tests inaccurately simulate the human lungs. Dr. Smith also testified that Intoxilyzer 5000 results could be inaccurate because they are based upon a testing of only part of a persons's breath. After reviewing Dr. Smith's testimony and appellant's offer of proof, we are unable to

determine what other "faulty underlying theories," if any, that Dr. Smith could have testified to that were excluded by the trial court.

In point of error two, appellant contends that Dr. Smith was prohibited from testifying as to "why the computation the machine makes is not accurate." As noted above, Dr. Smith did testify that the Intoxilyzer 5000 could produce inaccurate results because it measured only a part of a person's breath. We cannot conclude that the trial court committed error where appellant's offer of proof did not show the specific testimony excluded, especially where, as here, appellant was able to present testimony concerning potential inaccuracies of the Intoxilyzer 5000.

In point of error four, appellant contends that Dr. Smith was prohibited from testifying that the "techniques applied in this case weren't scientifically valid for the Intoxilyzer 5000." Again, we are unable to tell what testimony was prohibited, given the fact that Dr. Smith was able to testify about potentially erroneous techniques, such as inadequate observation periods, and appellant's offer of proof made no mention of specific techniques that he was precluded from testifying about.

In point of error five, appellant contends that Dr. Smith would have testified about the blood-breath ratio, body temperature, and hemocratic level as they relate to the validity of the Intoxilyzer 5000, and their "meaningfulness to appellant's intoxication in this case." The record indicates that Dr. Smith did testify about body weight and temperature and how it related to the Intoxilyzer 5000 results, and it appears as though the trial court gave appellant permission to question Dr. Smith about matters relevant to the facts of this particular case, stating that, "[I]f he did some tests on this instrument, if he did some breath or blood—uh—ratio tests on this defen-

dant ... or if this instrument was in some way deficient or out of repair or not in good repair, then, certainly, I think that's all relevant ..."

We are unable to determine from the record what testimony of Dr. Smith's was excluded. Appellant could have made an offer of proof in question and answer format with Dr. Smith, and could have obtained specific rulings on specific testimony, but he did not do so. Accordingly, we conclude that points of error one through five have not been preserved for our review.

### State's Closing Argument

■ In point of error six, appellant claims the State, in its closing argument, argued an incorrect statement of the law and contradicted the jury charge. Specifically, appellant contends the State improperly urged the jury to convict appellant "simply, solely, and automatically because there is a breath test result above .08." Appellant claims that this argument is contrary to the law because it invited the jury to concentrate on the alcohol in appellant's system at the time of the test, rather than at the time he was driving.

■ Permissible jury argument falls within one of four categories: (1) summation of the evidence; (2) reasonable deductions from the evidence; (3) pleas for law enforcement; and (4) responses to opposing counsel. *Felder v. State*, 848 S.W.2d 85, 94–95 (Tex.Crim.App.1992). In reviewing complaints about comments made during jury argument, the appellate courts review the comments within the context of the entire argument. *Drew v. State*, 743 S.W.2d 207, 220 (Tex.Crim.App.1987).

During its closing argument, the State argued as follows:

MS. HARTMAN: This is about the easiest case you're ever gonna have.

You've got a breath-test analysis above the legal limit. Per se, King's X, he's guilty. That's it. That's the law, and the Legislature—

MR. TRICHTER: That's an objection, Your Honor. She's taking the decision away from the jury.

THE COURT: Uh, this is closing Argument.

Uh, stay within the Record and the law. Please proceed.

MR. TRICHTER: And, Your Honor, she also misquoted the law. It has to be a .08 or—

THE COURT: I've made my ruling, Mr. Trichter. Thank you, sir. Please have a seat.

MR. TRICHTER: Your Honor, it's a different objection.

MS. HARTMAN: It is the law.

THE COURT: You made another objection?

MR. TRICHTER: Yes, Your Honor. That she misquoted the law, and it's a—

THE COURT: That's overruled.

MR. TRICHTER: It's a .08, and it's—

THE COURT: I've overruled the objection. You don't need to put that in the Record.

. . . .

MS. HARTMAN: And going back to the law in the State of Texas, it's .08 at *the time of driving.* Debbie Stephens testified that it was a .15. He blew a .134 and a .130. He was eliminating. He-he was a lot more out there *when he was driving.*

(Emphasis added.) Later in the closing argument, the State reminded the jury that an .08 blood alcohol level *at the time of driving* constitutes intoxication. It is apparent from the record that the State did not urge the jury to convict appellant

based on his blood alcohol level at the *time he performed the breath test.* The State properly focused its argument upon appellant's blood alcohol level at the time he was driving. In light of the entire record, we cannot say that the State's argument, as a whole, was improper. Accordingly, we overrule point of error six.

### Cross–Examination of Sergeant Morton

■ In point of error seven, appellant claims the trial court erred in preventing him from offering evidence about the lack of specialized training of Sergeant Morton. Appellant contends that, when the trial court sustained the State's objection to relevance, appellant was prevented from asking the Sergeant Morton whether he was a medical doctor, and whether he had any training in toxicology. During the cross-examination of Sergeant Morton, the following exchange occurred:

MR. TRICHTER: And you're not a medical doctor?

MS. HARTMAN: Your Honor, I have to object to the relevance.

THE COURT: Sustained.

MR. TRICHTER: Your Honor, the ... the relevance is—

THE COURT: I've made my ruling. If I'm incorrect, you'll win; but I've made my ruling. Let's move on.

MR. TRICHTER: You don't have any ... uh ... training in toxicology, do you?

MS. HARTMAN: Objection, Your Honor.

THE COURT: To?

MS. HARTMAN: The relevance. It's going along the same line.

THE COURT: Oh, sustained.

MR. TRICHTER: Doesn't this deal with with [sic] toxicology?

THE COURT: Oh, I've made my ruling, Mr. Trichter. I sustained the State's objection.

MR. TRICHTER: It's true you do not have any scientific degrees that give you any special knowledge about the body that you use in your work?

SGT. MORTON: No, I just have a Bachelor of Science degree in criminal justice.

. . . .

MR. TRICHTER: Now, suffice to say, you're not licensed in any capacity by the State of Texas to prescribe medication or glasses of any kind?

SGT. MORTON: No, sir.

MR. TRICHTER: Contact lenses?

SGT. MORTON: No, sir, I'm not.

■ We agree with appellant that the evidence was relevant. *See* Tex.R. Evid. 401. However, any error was harmless. Although appellant was prevented from asking Sergeant Morton whether he was a medical doctor or had training in toxicology, appellant was permitted to ask more generally whether he had any scientific degrees. Appellant was also permitted to ask Morton if he was licensed to prescribe medicine or glasses or contact lenses. The jury was able to infer from Morton's testimony that he was not a medical doctor and did not have any training in toxicology. Appellant elicited substantially the same testimony that the trial court had previously excluded. Any error in the trial court's ruling was thus rendered harmless. Accordingly, we overrule point of error seven.

### Request for Jury Shuffle

■ In point of error eight, appellant contends the trial court erred in denying his request for a jury shuffle. Appellant contends his substantial rights have been

affected and that he is entitled to a new trial.

 A defendant has an absolute right to a shuffle of the jury panel. TEX. CODE CRIM. PROC. ANN. art. 35.11 (Vernon Supp.2002); *Jones v. State,* 833 S.W.2d 146, 147 (Tex.Crim.App.1992). The motion for a jury shuffle must be made before voir dire begins. *Williams v. State,* 719 S.W.2d 573, 577 (Tex.Crim.App.1986) (en banc). Voir dire generally begins when the trial court recognizes the State as having started the examination. *Id.* In *Davis,* the Texas Court of Criminal Appeals modified *Williams* in holding that in capital felony cases, voir dire begins when the trial court begins its examination of the panel. *Davis v. State,* 782 S.W.2d 211, 216 (Tex.Crim.App.1989) (holding that the legislature intended the trial court to be more involved in the voir dire procedure in capital felony cases). The *Davis* court, while recognizing the role of *Williams* in ensuring that a defendant has ample opportunity to make a motion for a jury shuffle, stated that, "[W]e have never interpreted the [article 35.11] as requiring the trial court to afford the defendant anything more than being able to view the outward appearance of the venire members." *Id.* at 214. The *Davis* court went on to note that, "[T]o allow either party to request a shuffle after the voir dire begins ... would permit such an election to be based upon information elicited on voir dire ... [and] this was not the intent of the legislature." *Id.* (citations omitted). The *Davis* court ultimately held that, in that case, the defendant was not entitled to review juror information cards before being required to decide to request a jury shuffle. *Id.* ("[I]t was not the intent of the Legislature to base the shuffle on information gleaned from juror information cards.").

In light of *Davis,* a review of the circumstances in which the motion to shuffle was made will be helpful in determining whether the motion was timely. The record reflects that, before the venire panel was seated, the trial court asked both appellant and the State if they wanted to shuffle the jury. Both parties declined The trial court then informed the parties that they could again request a shuffle after they had reviewed the juror list. Appellant then requested time to review responses to the jury questionnaires. The trial court informed appellant that he could have "however long it takes for them to get ... the jury in order and bring 'em on in." After the panel was seated, the trial court again asked appellant if he wanted to shuffle the jury after having had a chance to review the panel. Appellant responded: "[H]aving seen them, not knowing anything about them, I don't know why I would want to shuffle them." The trial court then introduced itself to the jury and began questioning the venire panel.

The trial court first asked the members of the venire if any of them had served on a jury before and if any of them knew appellant or appellant's attorneys, and then if any of them knew the attorneys representing the State. The trial court then explained the allegations presented by the State and asked if anyone was familiar with the facts of the case. After these questions, the trial court explained the importance of being fair and impartial and why the voir dire process was important.

The trial court then proceeded to ask the following questions of the venire members: (1) whether or not any of them had ever received a traffic ticket, (2) whether or not they could follow the reasonable doubt standard, (3) whether or not they could presume appellant to be not guilty until proven otherwise, (4) whether or not they could afford appellant the right to remain silent without holding it against

him, (5) whether they had a friend, family member, close associate, or anyone who came to mind, who was a member of law enforcement, (6) whether those members of the panel who knew any law enforcement officers could be fair to appellant, (7) whether they had any negative experiences with law enforcement, (8) whether there were any members of the panel who did not drink alcohol, (9) whether any of them had ever been a victim, or knew of anyone who was a victim of a drunk driver, (10) whether they had ever contributed to Mothers Against Drunk Drivers or any other victim's rights organizations, (11) whether any of them felt that they could not sit in judgement on another because of religious convictions, and (12) whether any of them did not feel good about being jurors for any other reason.

The questions of the trial judge were frequently responded to by the panel, and the trial court asked follow up questions to clarify the responses. At the conclusion of the trial court's questioning, appellant requested a jury shuffle, stating that, "we know a whole lot more about 'em." The trial judge denied the request.

We conclude that, because of the nature and circumstances of the voir dire procedure in this case, the trial court did not err in denying appellant's request for a jury shuffle on grounds of timeliness. In *Williams*, which held that voir dire did not commence until the State had begun its examination, the trial judge did not engage in a detailed questioning of the panel. *Williams*, 719 S.W.2d at 574. The trial judge introduced herself, introduced the parties and their attorneys, explained that there were divisions between offenses, and that there were different penalties that could be applicable, read the indictment, discussed how the trial would work, and defined various legal terms that were used during the course of a trial. *Id.* The trial

judge in *Williams* then asked 3 questions: 1) whether anyone recognized the names of the parties, or knew the facts of the case, 2) whether anyone had questions as to what the State would have to prove, and 3) if anyone felt that they could not give a punishment within the range allowed by law. *Id.* Here, the trial court went well beyond the mere introductory remarks and began asking questions of the venire members traditionally asked by the State and a defendant during voir dire proceedings. For all intents and purposes, voir dire in this case began when the trial court began asking questions of the panel that were no longer related to introductory and administrative matters, and would have traditionally been asked by the parties themselves.

As for the concern expressed in *Williams* that a trial judge would be able to sua sponte begin giving introductory remarks and thus preclude a timely motion for a jury shuffle, the record reflects that the trial court here gave ample opportunity to both parties to request a jury shuffle after having viewed the panel. It was only then that the trial judge proceeded with introductory remarks and then went on to ask detailed questions of the jury. In interpreting *Williams*, we again note the comments of the *Davis* court (decided after *Williams*) that, "we have never interpreted the [article 35.11] as requiring the trial court to afford the defendant anything more than being able to view the outward appearance of the venire members." *Davis*, 782 S.W.2d at 214. In this case, appellant was clearly afforded the opportunity to request a jury shuffle after being able to view the outward appearance of the venire members. To allow appellant to request a jury shuffle after the lengthy questioning by the judge, and after appellant was given an opportunity to request a shuffle after seeing the panel, would contravene the intent of the legislature as it

has been interpreted by the Texas Court of Criminal Appeals. The *Davis* court was clear in its holding that the legislature did not intend for parties to be able to request a jury shuffle after either obtaining information during voir dire, or after having had the opportunity to obtain information from juror information cards. *Id.* We hold, in step with the intent of the legislature, that appellant no longer had an absolute right to a jury shuffle after delaying his request for a jury shuffle in order that he might obtain information traditionally acquired through the voir dire procedure. Given the facts in this case, the trial court did not err in denying appellant's subsequent request for a jury shuffle where he declined an opportunity to shuffle the jury panel after having been allowed to see the panel.

In sum, we hold that where a trial court provides an opportunity to request a jury shuffle after allowing the parties to see the panel, and then questions the panel and acquires information traditionally acquired through the voir dire procedure, the trial court does not commit error if, on grounds of timeliness, it denies a later motion to shuffle the jury.

■■■ Moreover, upon review of a trial court's denial of a motion to shuffle the jury, we may reverse only if we find that the defendant was harmed by the error. *Ford v. State,* 73 S.W.3d 923, 925 (Tex. Crim.App.2002). Any error in the denial of a request to shuffle the jury is nonconstitutional in nature. *Id.* at 924; *see* TEX. R.APP. P. 44.2(b). We will find that a defendant was harmed only when the denial of the motion to shuffle the jury affected one of his substantial rights. *Id.* at 925.

■■■ Appellant is not entitled to have any particular person serve on the jury. *Jones v. State,* 982 S.W.2d 386, 393 (Tex.Crim.App.1998). We must presume that the jurors ultimately selected to try the case are qualified unless the record indicates otherwise. *Ford,* 73 S.W.3d at 925. We are also to consider whether or not the "jury shuffle statute's purpose was thwarted by the error." *Id.* at 926.

■■■ Here, there is no indication in the record that those who ultimately served on the jury were unfit for duty. We now examine article 35.11 to see if any error by the trial court would thwart the purpose of the jury shuffle. The Court of Criminal Appeals, in interpreting the purpose of article 35.11, has noted that while parties use the jury shuffle for strategic purposes, the purpose of the statute is to "ensure the compilation of a random list of jurors." *Id.* The juror list is not random if the record indicates that the "process of assembling a jury was subverted," or the rules and statutes mandating random selection of jurors were disregarded, or the panel was reordered after being assembled. *Id.* Appellant does not argue, and there is nothing in the record before us to indicate, that the juror list was produced by non-random means. Accordingly, we find that appellant has not shown that he was harmed by the trial court's denial of his motion to shuffle the jury panel.

We overrule point of error eight.

### The State's Voir Dire

■■■ In point of error nine, appellant contends the trial court erred in overruling his objection to the State telling the panel members during voir dire that "normal use" of alcohol "is compared to the average, non-intoxicated individual," rather than to appellant. Appellant claims that this was a misstatement of the law, because the State was required to prove that appellant had lost the normal use of his own faculties.

During the voir dire examination, the State made the following statement:

Now, some of you are probably saying, "Okay, what's normal use," right? Well, normal use, in this sense, is compared to the average, non-intoxicated individual. In other words, if the police officers had to know what was normal for each Defendant, they wouldn't be able to arrest many Defendants, would they? Many people [sic] suspected of driving while intoxicated, would they?

Appellant claims that this was a misstatement of the law, because the State was required to prove that appellant had lost the normal use of his own faculties. Specifically, appellant claims that, based on the State's erroneous statements, the jury could find appellant guilty if alcohol had affected appellant to the extent that a normal, non-intoxicated person would have lost the normal use of his or her mental or physical faculties. The State claims that it did not misstate the law in its voir dire remarks.

This issue has been addressed by the Fort Worth, Texarkana, and Dallas courts of appeals. *See Fogle v. State*, 988 S.W.2d 891, 892 (Tex.App.-Fort Worth 1999, pet. ref'd); *Reagan v. State*, 968 S.W.2d 571, 572 (Tex.App.-Texarkana 1998, pet ref'd); *Massie v. State*, 744 S.W.2d 314, 316 (Tex. App.-Dallas 1988, pet. ref'd). The State's argument here on the correct statement of the law is substantially similar to the definitions used in *Reagan, Fogle,* and *Massie*. The *Massie* court was the first to address the issue. There, the defendant argued that there was no evidence of his *normal* use of *his* faculties, and thus no proof that he lost his normal use of them as alleged in the information. *Massie,* 744 S.W.2d at 316. The court held that the State did not have to present proof of a defendant's normal abilities. It stated:

We do not construe an allegation that appellant did not have normal use of his mental and physical faculties the same

as an allegation that appellant did not have his normal use of his faculties. The former allegation does not require proof of the defendant's normal abilities. Rather, it means that the faculties which must be tested belong to appellant. If there was evidence that appellant could not use his faculties on the occasion in question, in the manner in which the normal non-intoxicated person would be able to use his faculties, the evidence is sufficient to convict him unless the jury finds that his inability to perform on that occasion is not due to intoxicants (e.g. diabetes; epilepsy).

*Massie,* 744 S.W.2d at 316. Both the *Reagan* and *Fogle* courts followed this holding. *Reagan,* 968 S.W.2d at 572; *Fogle,* 988 S.W.2d at 894. We agree with the reasoning of those courts and, accordingly, hold that the trial court did not err in overruling appellant's objection that the State's argument amounted to a misstatement of the law. We overrule point of error nine.

## Trial Court's Comment on the Evidence

■ In his tenth point of error, appellant contends the trial court erred in commenting on the evidence in the presence of the jury and in denying appellant's request to instruct the jury to disregard the comment. Appellant further contends that the trial court's comments were calculated to, and did in fact convey that the trial court did not believe appellant's testimony concerning an alleged statement by a police officer.

During the direct examination of appellant, appellant testified that he was told by a police officer that, if he took the breath test and passed it, he would be allowed to go home. Appellant was then asked who told him that, and the State objected. In response to the State's objection the trial court stated as follows:

THE COURT: Well, I ... I disagree ... that it goes to the state of mind, but I'm gonna allow him to tell us who it was that said it for other reasons, if ... if it was said. Go ahead.

APPELLANT: Uh, they ... they told me I ... I would go home.

MR. TRICHTER: May I approach the Bench with the Prosecutor for a minute?

THE COURT: Yes.

(At the Bench, on the Record)

MR. TRICHTER: Judge, I'm real concerned that you may [sic] just commented on the evidence with your phrase, "If it was said," and ... and my fear is that's a critical bit of information that's gonna go to a Charge that I'm gonna ask you for on the voluntariness of the test, so I'm asking you if you would give an instruction to the jury?

THE COURT: I will not. I will not; and I disagree with you.

 A trial court improperly comments on the weight of the evidence if he makes a statement that implies approval of the State's argument, indicates any disbelief in the defense's position, or diminishes the credibility of the defense's approach to its case. *Clark v. State,* 878 S.W.2d 224, 226 (Tex.App.-Dallas 1994, no pet.). We cannot conclude that the trial court's comment was a statement of approval of the State's argument, disbelief in the defense's position, or an effort to diminish the credibility of the defense's approach to the case. Whether the alleged statements were actually made by the police was a question for the jury to resolve. The trial court stated that appellant could testify about "who it was that said it." The statement that followed, "if it was said," could have been interpreted as a proper reminder by the trial court to the jury that, it was the jury, not the trial court who would resolve that issue. *See Johnson v. State,* 23 S.W.3d 1, 7 (Tex.Crim.App.2000) (holding that the jury is the judge of the weight and credibility given to witness testimony). Because we cannot determine that the trial court's remarks were a comment on the weight of the evidence, we overrule point of error ten.

## Conclusion

We affirm the trial court's judgment.