Opinion issued on November 21, 2002












In The
Court of Appeals
For The
First District of Texas
____________

NO. 01-00-01185-CR
____________

CHARLES DENVER RAILSBACK, Appellant

V.

THE STATE OF TEXAS, Appellee




On Appeal from the County Criminal Court at Law No. 14
Harris County, Texas
Trial Court Cause No. 1004182




O P I N I O N
          Appellant, Charles Denver Railsback, was charged in a two-paragraph
information with driving while intoxicated (DWI) by not having the normal use of his
mental and physical faculties and by having an alcohol concentration of at least .08
in his breath. A jury found appellant guilty of DWI, and the trial court assessed
punishment at 180 days in jail, probated for one year, and a $1,000 fine. See Tex.
Pen. Code Ann. § 49.04 (Vernon Supp. 2002). Appellant brings ten points of error,
challenging (1) the exclusion of portions of appellant’s expert witness’s testimony on
the Intoxilyzer 5000; (2) the State’s jury argument that a breath test result above the
legal limit automatically meant appellant was guilty; (3) the exclusion of evidence
about the lack of the State’s witness’s specialized training; (4) the denial of
appellant’s request for a jury shuffle; (5) comments made by the State during voir
dire; and (6) the trial court’s alleged comment on the evidence. We affirm.

Facts

          On June 3, 2000, Houston Police Officer William H. Lindsey was stopped at
a red stop-light next to a Jeep Cherokee. When the stop-light turned green, appellant
accelerated at a high rate of speed. Lindsey paced appellant’s car using a radar gun
and determined the Jeep was traveling at 60 miles per hour in a 35 mile per hour zone.
Lindsey stopped appellant for speeding. When he approached the driver’s side
window of appellant’s car, Officer Lindsey saw two passengers and noticed a strong
alcoholic-beverage smell. Lindsey described appellant as having glassy, watery eyes,
a dazed look on his face, and having somewhat slurred but understandable speech. 
Lindsey and Houston Police Department Sergeant C.B. Morton administered the
horizontal-gaze-nystagmus, Rhomberg, one-leg-stand, and walk-and-turn tests to
appellant at the scene of the stop. The officers testified that the results of these tests
indicated a strong possibility to them that appellant was intoxicated, although
appellant did not stumble or have trouble following the officers’ instructions. 
Appellant told the officers that he had consumed three beers and one shot of tequila
in the previous three and one-half hours.

          Appellant was taken to a police station where Officer Paul Witherington
readministered the Rhomberg, one-leg-stand, and walk-and-turn tests. Although
appellant did poorly on these tests, he was able to recite the alphabet and touch his
nose. Witherington did not notice that appellant had slurred speech or smelled of
alcohol. At trial, Witherington stated that appellant’s performance on the field-sobriety tests could have been normal if pre-existing injuries were affecting
appellant’s physical abilities. Appellant testified that he had previously undergone
back surgery, and Officer Morton agreed with appellant at trial that appellant was
approximately 60 to 80 pounds overweight at the time of his arrest.

          Appellant took a breath test, which was analyzed by an Intoxilyzer 5000
breathalyzer. The test result indicated an alcohol concentration of 0.134 and 0.130
grams of alcohol per 210 liters of breath. For purposes of a DWI charge, intoxication
is defined as having an alcohol concentration of 0.08 grams of alcohol per 210 liters
of breath. Tex. Pen. Code Ann. § 49.01 (Vernon Supp. 2002). Intoxication is also
defined as “not having the normal use of mental or physical faculties by reason of the
introduction of alcohol . . . into the body.” Id. The trial court’s charge submitted
both definitions to the jury.

          At trial, appellant called Dr. Ken Smith, Ph.D., a physics professor at Rice
University, as an expert witness on the Intoxilyzer 5000. The trial court sua sponte
questioned the relevancy of Dr. Smith’s potential testimony: 

What—what I’m trying to figure out is under [Texas] Rule [of Evidence]
104, whether or not he has anything relevant to say with regard to this
case, or is he just going to testify about potential problems generally
with the Intoxilyzer, or whether there’s problems with this Intoxilyzer. 
I don’t want to—I don’t want to put the Intoxilyzer instrument on
trial—at least not in here—in this case.



Despite the trial court’s initial unwillingness to allow testimony of general problems
with the Intoxilyzer 5000, Dr. Smith was permitted to testify about several flaws in
the machine.

Exclusion of Dr. Smith’s Testimony

          In points of error one through five, appellant argues the trial court erred when
it excluded some of Dr. Smith’s testimony on grounds of relevance. Appellant
contends in points of error one through five that Dr. Smith should have been able to
testify about (1) the “underlying theories that breath-test machines are premised on,
and why they’re inaccurate”; (2) “why the computation the machine makes is not
accurate”; (3) why “the theory underlying the breath-test techniques is not valid for
the Intoxilyzer 5000”; (4) why the techniques applied in this case were not
scientifically valid for the Intoxilyzer 5000; and (5) the effects of the blood-breath
ratio, body temperature, and hematocrit level on the validity of the Intoxilyzer 5000
result, and their meaningfulness to appellant’s intoxication in this case. 

          The trial court ruled that it was excluding some of appellant’s proposed
testimony on grounds of relevance. The trial court agreed to admit evidence of
specific problems with the Intoxilyzer 5000 as it applied to the facts of the case,
ruling that, “[I]f he did some tests on this instrument, if he did some breath or
blood— uh— ratio test . . . or if this instrument was in some way deficient or out of
repair or not in good repair, then, certainly I think that’s all relevant . . .” However,
the trial court did not want Dr. Smith to testify about possible flaws in the general
underlying theories that the Intoxilyzer was based on, stating that “[W]ith respect to
the underlying theory of breath testing generally, I think that’s far afield . . . and . .
. it takes up too much time . . . .” 

          It has been well established that a defendant has the right to attack the weight
and credibility of evidence presented against him by the State, and courts have
specifically recognized the right of a defendant to attack breath-test results. Love v.
State, 861 S.W.2d 899, 903 (Tex. Crim. App. 1993) (noting that defendant’s proposed
attack on intoxilyzer results would make it less probable that he was intoxicated);
Moore v. State, 981 S.W.2d 701, 708 (Tex. App.—Houston [1st Dist.] 1998, pet.
ref’d) (“[I]f a defendant wishes to attack the reliability of breath testing as a rule or
the reliability of a specific testing instrument, he may do so.”). 

          In this case, while the trial court initially ruled that it would not allow Dr.
Smith to testify as to a flawed general underlying theory, it is not clear from the
record that Dr. Smith was prohibited from discussing the matters that appellant asserts
in points of error one through five. The record indicates that Dr. Smith attacked the
reliability of the Intoxilyzer 5000 by testifying that it did not test the “whole breath”
of a person, and he was able to explain in detail why that could cause erroneous
results. Dr. Smith also discussed the importance of the observation period used in the
testing process and the possibility of error that could result when the observation
period was not adequate. Dr. Smith also testified that everyone has different body
and breath temperatures, which could affect the results of the Intoxilyzer test. In
response to a hypothetical, Dr. Smith testified that a 265-pound person who
consumed three beers and a shot of tequila within three and one-half hours could not
have achieved a .13 blood-alcohol level. Dr. Smith stated that a result of .13 could
not be a reliable result and would be wrong. Finally, Dr. Smith testified that
reliability studies done on the Intoxilyzer 5000 were not accurate because the
simulation of lungs in the tests were not accurate representations of human lungs.

          If Dr. Smith was prohibited from testifying as to relevant matters, those matters
needed to have been adequately detailed in an offer of proof if they were not apparent
from the context of the questioning. Tex. R. Evid. 103(a)(2). Here, it is not clear
what testimony Dr. Smith was prohibited from giving, so an offer of proof was
necessary to preserve error for our review. Id.; Garza v. State, 846 S.W.2d 936, 939
(Tex. App.—Houston [1st Dist.] 1993, pet. ref’d). An offer of proof needs to show
the facts that a defendant wishes to prove; if it does not do so, the issue is not
preserved for appellate review. Jenkins v. State, 948 S.W.2d 769, 775 (Tex.
App.—San Antonio 1997, pet. ref’d).

          Appellant’s offer of proof in this case was as follows: 

Had you heard Dr. Smith testify, he would have told you that the theory
underlying the breath-test technique is not valid for the Intoxilyzer 5000.
. . . He would have also testified that the techniques applied in this case
wasn’t [sic] scientifically valid for the Intoxilyzer 5000, and that there
were a number of assumptions that breath-test machines, the 5000
included, make that are based upon . . . Dr. Smith would
have—uh—talked about the 2100-to-1 blood-breath ratio and how that
did not necessarily apply to [appellant] in this case, and if he had a
different ratio, that he—the Intoxilyzer would have read too high for
him. The same in terms of temperature, his body temperature and
hematocrit level. 



          Appellant’s offer of proof fails to show us that Dr. Smith was unable to testify
about the matters asserted in appellant’s points of error one through five. In points
of error one and three, appellant complains that Dr. Smith was not able to testify
about faulty underlying theories that make the Intoxilyzer inaccurate. However, Dr.
Smith testified that the Intoxilyzer 5000 is not as accurate as the reliability studies
indicate, because the tests inaccurately simulate the human lungs. Dr. Smith also
testified that Intoxilyzer 5000 results could be inaccurate because they are based upon
a testing of only part of a persons’s breath. After reviewing Dr. Smith’s testimony
and appellant’s offer of proof, we are unable to determine what other “faulty
underlying theories,” if any, that Dr. Smith could have testified to that were excluded
by the trial court.

          In point of error two, appellant contends that Dr. Smith was prohibited from
testifying as to “why the computation the machine makes is not accurate.” As noted
above, Dr. Smith did testify that the Intoxilyzer 5000 could produce inaccurate results
because it measured only a part of a person’s breath. We cannot conclude that the
trial court committed error where appellant’s offer of proof did not show the specific
testimony excluded, especially where, as here, appellant was able to present testimony
concerning potential inaccuracies of the Intoxilyzer 5000. 

          In point of error four, appellant contends that Dr. Smith was prohibited from
testifying that the “techniques applied in this case weren’t scientifically valid for the
Intoxilyzer 5000.” Again, we are unable to tell what testimony was prohibited, given
the fact that Dr. Smith was able to testify about potentially erroneous techniques, such
as inadequate observation periods, and appellant’s offer of proof made no mention
of specific techniques that he was precluded from testifying about. 

          In point of error five, appellant contends that Dr. Smith would have testified
about the blood-breath ratio, body temperature, and hemocratic level as they relate
to the validity of the Intoxilyzer 5000, and their “meaningfulness to appellant’s
intoxication in this case.” The record indicates that Dr. Smith did testify about body
weight and temperature and how it related to the Intoxilyzer 5000 results, and it
appears as though the trial court gave appellant permission to question Dr. Smith
about matters relevant to the facts of this particular case, stating that, “[I]f he did
some tests on this instrument, if he did some breath or blood—uh—ratio tests on this
defendant . . . or if this instrument was in some way deficient or out of repair or not
in good repair, then, certainly, I think that’s all relevant . . .” 

          We are unable to determine from the record what testimony of Dr. Smith’s was
excluded. Appellant could have made an offer of proof in question and answer
format with Dr. Smith, and could have obtained specific rulings on specific
testimony, but he did not do so. Accordingly, we conclude that points of error one
through five have not been preserved for our review.

State’s Closing Argument

          In point of error six, appellant claims the State, in its closing argument, argued
an incorrect statement of the law and contradicted the jury charge. Specifically,
appellant contends the State improperly urged the jury to convict appellant “simply,
solely, and automatically because there is a breath test result above .08.” Appellant
claims that this argument is contrary to the law because it invited the jury to
concentrate on the alcohol in appellant’s system at the time of the test, rather than at
the time he was driving.

          Permissible jury argument falls within one of four categories: (1) summation
of the evidence; (2) reasonable deductions from the evidence; (3) pleas for law
enforcement; and (4) responses to opposing counsel. Felder v. State, 848 S.W.2d 85,
94-95 (Tex. Crim. App. 1992). In reviewing complaints about comments made
during jury argument, the appellate courts review the comments within the context
of the entire argument. Drew v. State, 743 S.W2d 207, 220 (Tex. Crim. App. 1987). 

          During its closing argument, the State argued as follows:

          MS. HARTMAN: This is about the easiest case you’re ever gonna have. 
You’ve got a breath-test analysis above the legal limit. Per
se, King’s X, he’s guilty. That’s it. That’s the law, and the
Legislature—

 
          MR. TRICHTER:  That’s an objection, Your Honor. She’s taking the decision
away from the jury.

 
          THE COURT:       Uh, this is closing Argument.

                                         Uh, stay within the Record and the law. Please proceed.

 
          MR. TRICHTER:  And, Your Honor, she also misquoted the law. It has to be
a .08 or—

 
          THE COURT:       I’ve made my ruling, Mr. Trichter. Thank you, sir. Please
have a seat.

 
          MR. TRICHTER:  Your Honor, it’s a different objection.

 
          MS. HARTMAN: It is the law.

 
          THE COURT:       You made another objection?

 
          MR. TRICHTER:  Yes, Your Honor. That she misquoted the law, and it’s a— 

 
          THE COURT:       That’s overruled.

 
          MR. TRICHTER:  It’s a .08, and it’s— 

 
          THE COURT:       I’ve overruled the objection. You don’t need to put that in
the Record.

           . . . .

 
          MS. HARTMAN: And going back to the law in the State of Texas, it’s .08 at
the time of driving. Debbie Stephens testified that it was a
.15. He blew a .134 and a .130. He was eliminating. He-
he was a lot more out there when he was driving.

 

(Emphasis added.) Later in the closing argument, the State reminded the jury that an
.08 blood alcohol level at the time of driving constitutes intoxication. It is apparent
from the record that the State did not urge the jury to convict appellant based on his
blood alcohol level at the time he performed the breath test. The State properly
focused its argument upon appellant’s blood alcohol level at the he was driving. In
light of the entire record, we cannot say that the State’s argument, as a whole, was
improper. Accordingly, we overrule point of error six.

Cross-Examination of Sergeant Morton

          In point of error seven, appellant claims the trial court erred in preventing him
from offering evidence about the lack of specialized training of Sergeant Morton. 
Appellant contends that, when the trial court sustained the State’s objection to
relevance, appellant was prevented from asking the Sergeant Morton whether he was
a medical doctor, and whether he had any training in toxicology. During the cross-examination of Sergeant Morton, the following exchange occurred:

          MR. TRICHTER:  And you’re not a medical doctor?

 
          MS. HARTMAN: Your Honor, I have to object to the relevance.

 
          THE COURT:       Sustained.

          MR. TRICHTER:  Your Honor, the . . . the relevance is—

 
          THE COURT:       I’ve made my ruling. If I’m incorrect, you’ll win; but I’ve
made my ruling. Let’s move on.

 
          MR. TRICHTER:   You don’t have any . . . uh . . . training in toxicology, do
you?



          MS. HARTMAN: Objection, Your Honor.

 
          THE COURT:       To?

 
          MS. HARTMAN: The relevance. It’s going along the same line.

 
          THE COURT:       Oh, sustained.

 
          MR. TRICHTER:  Doesn’t this deal with with [sic] toxicology?

 
          THE COURT:       Oh, I’ve made my ruling, Mr. Trichter. I sustained the
State’s objection.

 
          MR. TRICHTER:  It’s true you do not have any scientific degrees that give
you any special knowledge about the body that you use in
your work?

 
          SGT. MORTON:  No, I just have a Bachelor of Science degree in criminal
justice. 

. . . .



 
          MR. TRICHTER:  Now, suffice to say, you’re not licensed in any capacity by
the State of Texas to prescribe medication or glasses of any
kind?

 
          SGT. MORTON:  No, sir.

 
          MR. TRICHTER:  Contact lenses?

 
          SGT. MORTON:  No, sir, I’m not.

          We agree with appellant that the evidence was relevant. See Tex. R. Evid. 401. 
However, any error was harmless. Although appellant was prevented from asking
Sergeant Morton whether he was a medical doctor or had training in toxicology,
appellant was permitted to ask more generally whether he had any scientific degrees. 
Appellant was also permitted to ask Morton if he was licensed to prescribe medicine
or glasses or contact lenses. The jury was able to infer from Morton’s testimony that
he was not a medical doctor and did not have any training in toxicology. Appellant
elicited substantially the same testimony that the trial court had previously excluded. 
Any error in the trial court’s ruling was thus rendered harmless. Accordingly, we
overrule point of error seven.

Request for Jury Shuffle

          In point of error eight, appellant contends the trial court erred in denying his
request for a jury shuffle. Appellant contends his substantial rights have been
affected and that he is entitled to a new trial. 

          A defendant has an absolute right to a shuffle of the jury panel. Tex. Code
Crim. Proc. Ann. art. 35.11 (Vernon Supp. 2002); Jones v. State, 833 S.W.2d 146,
147 (Tex. Crim. App. 1992). The motion for a jury shuffle must be made before voir
dire begins. Williams v. State, 719 S.W.2d 573, 577 (Tex. Crim. App. 1986) (en
banc). Voir dire generally begins when the trial court recognizes the State as having
started the examination. Id. In Davis, the Texas Court of Criminal Appeals modified
Williams in holding that in capital felony cases, voir dire begins when the trial court
begins its examination of the panel. Davis v. State, 782 S.W.2d 211, 216 (Tex. Crim.
App. 1989) (holding that the legislature intended the trial court to be more involved
in the voir dire procedure in capital felony cases). The Davis court, while
recognizing the role of Williams in ensuring that a defendant has ample opportunity
to make a motion for a jury shuffle, stated that, “[W]e have never interpreted the
[article 35.11] as requiring the trial court to afford the defendant anything more than
being able to view the outward appearance of the venire members.” Id. at 214. The
Davis court went on to note that, “[T]o allow either party to request a shuffle after the
voir dire begins . . . would permit such an election to be based upon information
elicited on voir dire . . . [and] this was not the intent of the legislature.” Id. (citations
omitted). The Davis court ultimately held that, in that case, the defendant was not
entitled to review juror information cards before being required decide to request a
jury shuffle. Id. (“[I]t was not the intent of the Legislature to base the shuffle on
information gleaned from juror information cards.”).

          In light of Davis, a review of the circumstances in which the motion to shuffle
was made will be helpful in determining whether the motion was timely. The record
reflects that, before the venire panel was seated, the trial court asked both appellant
and the State if they wanted to shuffle the jury. Both parties declined The trial court
then informed the parties that they could again request a shuffle after they had
reviewed the juror list. Appellant then requested time to review responses to the jury
questionnaires. The trial court informed appellant that he could have “however long
it takes for them to get . . . the jury in order and bring ’em on in.” After the panel was
seated, the trial court again asked appellant if he wanted to shuffle the jury after
having had a chance to review the panel. Appellant responded: “[H]aving seen them,
not knowing anything about them, I don’t know why I would want to shuffle them.” 
The trial court then introduced itself to the jury and began questioning the venire
panel. 

          The trial court first asked the members of the venire if any of them had served
on a jury before and if any of them knew appellant or appellant’s attorneys, and then
if any of them knew the attorneys representing the State. The trial court then
explained the allegations presented by the State and asked if anyone was familiar with
the facts of the case. After these questions, the trial court explained the importance
of being fair and impartial and why the voir dire process was important. 

          The trial court then proceeded to ask the following questions of the venire
members: (1) whether or not any of them had ever received a traffic ticket, 2) whether
or not they could follow the reasonable doubt standard, 3) whether or not they could
presume appellant to be not guilty until proven otherwise, 4) whether or not they
could afford appellant the right to remain silent without holding it against him, (5)
whether they had a friend, family member, close associate, or anyone who came to
mind, who was a member of law enforcement, (6) whether those members of the
panel who knew any law enforcement officers could be fair to appellant, (7) whether
they had any negative experiences with law enforcement, (8) whether there were any
members of the panel who did not drink alcohol, (9) whether any of them had ever
been a victim, or knew of anyone who was a victim of a drunk driver, (10) whether
they had ever contributed to Mothers Against Drunk Drivers or any other victim’s
rights organizations, (11) whether any of them felt that they could not sit in
judgement on another because of religious convictions, and (12) whether any of them
did not feel good about being jurors for any other reason. 

          The questions of the trial judge were frequently responded to by the panel, and
the trial court asked follow up questions to clarify the responses. At the conclusion
of the trial court’s questioning, appellant requested a jury shuffle, stating that, “we
know a whole lot more about ’em.” The trial judge denied the request.

          We conclude that, because of the nature and circumstances of the of the voir
dire procedure in this case, the trial court did not err in denying appellant’s request
for a jury shuffle on grounds of timeliness. In Williams, which held that voir dire did
not commence until the State had begun its examination, the trial judge did not
engage in a detailed questioning of the panel. Williams, 719 S.W.2d at 574. The trial
judge introduced herself, introduced the parties and their attorneys, explained that
there were divisions between offenses, and that there were different penalties that
could be applicable, read the indictment, discussed how the trial would work, and
defined various legal terms that were used during the course of a trial. Id. The trial
judge in Williams then asked 3 questions: 1) whether anyone recognized the names
of the parties, or knew the facts of the case, 2) whether anyone had questions as to
what the State would have to prove, and 3) if anyone felt that they could not give a
punishment within the range allowed by law. Id. Here, the trial court went well
beyond the mere introductory remarks and began asking questions of the venire
members traditionally asked by the State and a defendant during voir dire
proceedings. For all intents and purposes, voir dire in this case began when the trial
court began asking questions of the panel that were no longer related to introductory
and administrative matters, and would have traditionally been asked by the parties
themselves.

          As for the concern expressed in Williams that a trial judge would be able to sua
sponte begin giving introductory remarks and thus preclude a timely motion for a jury
shuffle, the record reflects that the trial court here gave ample opportunity to both
parties to request a jury shuffle after having viewed the panel. It was only then that
the trial judge proceeded with introductory remarks and then went on to ask detailed
questions of the jury. In interpreting Williams, we again note the comments of the
Davis court (decided after Williams) that, “we have never interpreted the [article
35.11] as requiring the trial court to afford the defendant anything more than being
able to view the outward appearance of the venire members.” Davis, 782 S.W.2d at
214. In this case, appellant was clearly afforded the opportunity to request a jury
shuffle after being able to view the outward appearance of the venire members. To
allow appellant to request a jury shuffle after the lengthy questioning by the judge,
and after appellant was given an opportunity to request a shuffle after seeing the
panel, would contravene the intent of the legislature as it has been interpreted by the
Texas Court of Criminal Appeals. The Davis court was clear in its holding that the
legislature did not intend for parties to be able to request a jury shuffle after either
obtaining information during voir dire, or after having had the opportunity to obtain
information from juror information cards. Id. We hold, in step with the intent of the
legislature, that appellant no longer had an absolute right to a jury shuffle after
delaying his request for a jury shuffle in order that he might obtain information
traditionally acquired through the voir dire procedure. Given the facts in this case,
the trial court did not err in denying appellant’s subsequent request for a jury shuffle
where he declined an opportunity to shuffle the jury panel after having been allowed
to see the panel.

          In sum, we hold that where a trial court provides an opportunity to request a
jury shuffle after allowing the parties to see the panel, and then questions the panel
and acquires information traditionally acquired through the voir dire procedure, the
trial court does not commit error if, on grounds of timeliness, it denies a later motion
to shuffle the jury.

          Moreover, upon review of a trial court’s denial of a motion to shuffle the jury,
we may reverse only if we find that the defendant was harmed by the error. Ford v.
State, 73 S.W.3d 923, 925 (Tex. Crim. App. 2002). Any error in the denial of a
request to shuffle the jury is nonconstitutional in nature. Id. at 924; see Tex. R. App.
P. 44.2(b). We will find that a defendant was harmed only when the denial of the
motion to shuffle the jury affected one of his substantial rights. Id. at 925.

          Appellant is not entitled to have any particular person serve on the jury. Jones
v. State, 982 S.W.2d 386, 393 (Tex. Crim. App. 1998). We must presume that the
jurors ultimately selected to try the case are qualified unless the record indicates
otherwise. Ford, 73 S.W.3d at 925. We are also to consider whether or not the “jury
shuffle statute’s purpose was thwarted by the error.” Id. at 926.

          Here, there is no indication in the record that those who ultimately served on
the jury were unfit for duty. We now examine article 35.11 to see if any error by the
trial court would thwart the purpose of the jury shuffle. The Court of Criminal
Appeals, in interpreting the purpose of article 35.11, has noted that while parties use
the jury shuffle for strategic purposes, the purpose of the statute is to “ensure the
compilation of a random list of jurors.” Id. The juror list is not random if the record
indicates that the “process of assembling a jury was subverted,” or the rules and
statutes mandating random selection of jurors were disregarded, or the panel was
reordered after being assembled. Id. Appellant does not argue, and there is nothing
in the record before us to indicate, that the juror list was produced by non-random
means. Accordingly, we find that appellant has not shown that he was harmed by the
trial court’s denial of his motion to shuffle the jury panel. 

          We overrule point of error eight.

The State’s Voir Dire

          In point of error nine, appellant contends the trial court erred in overruling his
objection to the State telling the panel members during voir dire that “normal use” of
alcohol “is compared to the average, non-intoxicated individual,” rather than to
appellant. Appellant claims that this was a misstatement of the law, because the State
was required to prove that appellant had lost the normal use of his own faculties.

          During the voir dire examination, the State made the following statement:

Now, some of you are probably saying, “Okay, what’s normal
use,” right? Well, normal use, in this sense, is compared to the
average, non-intoxicated individual. In other words, if the police
officers had to know what was normal for each Defendant, they
wouldn’t be able to arrest many Defendants, would they? Many
people [sic] suspected of driving while intoxicated, would they?

          Appellant claims that this was a misstatement of the law, because the State was
required to prove that appellant had lost the normal use of his own faculties. 
Specifically, appellant claims that, based on the State’s erroneous statements, the jury
could find appellant guilty if alcohol had affected appellant to the extent that a
normal, non-intoxicated person would have lost the normal use of his or her mental
or physical faculties. The State claims that it did not misstate the law in its voir dire
remarks. 

          This issue has been addressed by the Fort Worth,Texarkana, and Dallas courts
of appeals. See Fogle v. State, 988 S.W.2d 891, 892 (Tex. App.—Fort Worth 1999,
pet. ref’d); Reagan v. State, 968 S.W.2d 571, 572 (Tex. App.—Texarkana 1998, pet
ref’d); Massie v. State, 744 S.W.2d 314, 316 (Tex. App.—Dallas 1988, pet. ref’d). 
The State’s argument here on the correct statement of the law is substantially similar
to the definitions used in Reagan, Fogle, and Massie. The Massie court was the first
to address the issue. There, the defendant argued that there was no evidence of his
normal use of his faculties, and thus no proof that he lost his normal use of them as
alleged in the information. Massie, 744 S.W.2d at 316. The court held that the State
did not have to present proof of a defendant’s normal abilities. It stated:

We do not construe an allegation that appellant did not have normal use
of his mental and physical faculties the same as an allegation that
appellant did not have his normal use of his faculties. The former
allegation does not require proof of the defendant’s normal abilities. 
Rather, it means that the faculties which must be tested belong to
appellant. If there was evidence that appellant could not use his
faculties on the occasion in question, in the manner in which the normal
non-intoxicated person would be able to use his faculties, the evidence
is sufficient to convict him unless the jury finds that his inability to
perform on that occasion is not due to intoxicants (e.g. diabetes;
epilepsy).

Massie, 744 S.W.2d at 316. Both the Reagan and Fogle courts followed this holding. 
Reagan, 968 S.W.2d at 572; Fogle, 988 S.W.2d at 894. We agree with the reasoning
of those courts and, accordingly, hold that the trial court did not err in overruling
appellant’s objection that the State’s argument amounted to a misstatement of the law. 
We overrule point of error nine.

Trial Court’s Comment on the Evidence

          In his tenth point of error, appellant contends the trial court erred in
commenting on the evidence in the presence of the jury and in denying appellant’s
request to instruct the jury to disregard the comment. Appellant further contends that
the trial court’s comments were calculated to, and did in fact convey that the trial
court did not believe appellant’s testimony concerning an alleged statement by a
police officer. 

          During the direct examination of appellant, appellant testified that he was told
by a police officer that, if he took the breath test and passed it, he would be allowed
to go home. Appellant was then asked who told him that, and the State objected. In
response to the State’s objection the trial court stated as follows:

          THE COURT:       Well, I . . . I disagree . . . that it goes to the state of mind,
but I’m gonna allow him to tell us who it was that said it
for other reasons, if . . . if it was said. Go ahead.

 
          APPELLANT:      Uh, they . . . they told me I . . . I would go home.

 
          MR. TRICHTER:  May I approach the Bench with the Prosecutor for a
minute?

 
          THE COURT:       Yes.



          (At the Bench, on the Record)

 
          MR. TRICHTER:  Judge, I’m real concerned that you may [sic] just
commented on the evidence with your phrase, “If it was
said,” and . . . and my fear is that’s a critical bit of
information that’s gonna go to a Charge that I’m gonna ask
you for on the voluntariness of the test, so I’m asking you
if you would give an instruction to the jury?

 
          THE COURT:       I will not. I will not; and I disagree with you.



          A trial court improperly comments on the weight of the evidence if he makes
a statement that implies approval of the State’s argument, indicates any disbelief in
the defense’s position, or diminishes the credibility of the defense’s approach to its
case. Clark v. State, 878 S.W.2d 224, 226 (Tex. App.—Dallas 1994, no pet.). We
cannot conclude that the trial court’s comment was a statement of approval of the
State’s argument, disbelief in the defense’s position, or an effort to diminish the
credibility of the defense’s approach to the case. Whether the alleged statements were
actually made by the police was a question for the jury to resolve. The trial court
stated that appellant could testify about “who it was that said it.” The statement that
followed, “if it was said,” could have been interpreted as a proper reminder by the
trial court to the jury that, it was the jury, not the trial court who would resolve that
issue. See Johnson v. State, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000) (holding that the
jury is the judge of the weight and credibility given to witness testimony). Because
we cannot determine that the trial court’s remarks were a comment on the weight of
the evidence, we overrule point of error ten.

Conclusion

We affirm the trial court’s judgment.

 
 
Sherry Radack

JusticePanel consists of Justices Taft, Radack, and Alcala.




Publish. Tex. R. App. P. 47.4.